## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JOSE A. RODRIGUEZ, *pro se,*

      Plaintiff,

v.                                   Case No: 8:14-cv-945-T-30TGW

HSBC BANK USA, N.A.,

      Defendant.

_____

### <u>ORDER</u>

Plaintiff Jose Rodriguez, proceeding *pro se*, claims that his former employer, Defendant HSBC Bank, discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. §§12101-12213 (ADA), and the Florida Civil Rights Act, Fla. Stat. §§ 760.01-760.11 (FCRA). Before the Court is Defendant's Motion for Summary Judgment (Dkt. 39). Plaintiff filed a brief response (Dkt. 41) suggesting that he has submitted all relevant evidence. The Court agrees that the cause is ripe. Having reviewed the filings, the record evidence, and the applicable law, the Court concludes that Plaintiff has failed to present any genuine issue of material fact and that, accordingly, Defendant's motion should be granted.

### FACTUAL BACKGROUND

Jose Rodriguez is a gay man who contracted the Human Immunodeficiency Virus (HIV) in 1998. (Rodriguez Dep., p. 42). Rodriguez was hired to work at HSBC in

September 2004 and worked there until he resigned in August 2010. (Id., at 141). Although Rodriguez claims that HSBC subjected him to employment discrimination, and HSBC denies that claim, the parties agree on most—but not all—of the relevant facts.

***Undisputed Facts***

Rodriguez was first hired in 2004 to work as a Senior Personal Banker at HSBC's Miami Beach branch. (Id., at 101). In May 2007, after Rodriguez had notified the HSBC Human Resources Department of his HIV status, he was promoted to Premier Relationship Manager, a job in which he ran his own portfolio of higher-end bank customers—i.e. those with at least $100,000.00 in deposits. (Id., at 46, 155; Graison Dep., p. 12). While his job description remained the same, Rodriguez's job title was upgraded in June 2008 to "Senior Premier Relationship Manager" and again in October 2009 to "Vice President – Premier Relationship Manager." (Rodriguez Dep., p. 47-48; Seymour Aff. ¶ 5).

Throughout his employment with HSBC, Rodriguez reported directly to Branch Manager Argenis Graison. (Graison Dep., p. 11). During the time he was a Premier Relationship Manager, Rodriguez also reported to Senior Premier Relationship Manager Eddie Jackson. (Id.). Like Rodriguez, Graison is a gay man. (Id., at 23-24). He and Jackson both have relatives who have died from AIDS. (Id., at 26; Jackson Dep., p. 146).

HSBC employees receive end-of-year evaluations, what the bank calls an employee "scorecard." (See Rodriguez Dep., p. 171, Ex. 41). In 2009, Rodriguez received a "Strong 3" rating out of a range of 1 to 5 on his scorecard. (Rodriguez Dep., p. 189, Ex. 41). The

year-end summary on the scorecard, however, notified Rodriguez that he was falling short

on some of his employment objectives:

> [Rodriguez] in 2010 has to put in extra efforts in growing his business with new blood customers that from the start will work with him on a holistic approach. His profiling of customers has to improve as well as his presentation skills. He has been performing as a [Premier Relationship Manager] for over 3 years now so we cannot accept more excuses in the quality of delivery that he has to present to all customers.

(Rodriguez Dep., Ex. 41).

On January 15, 2010, Graison and Jackson met with Rodriguez to discuss his

evaluation and to implement remedial measures so that Rodriguez could improve his work

performance. (Id.). Graison and Jackson memorialized that meeting with a January 19,

2010 memorandum to Rodriguez, which specified five areas in which they expected

improvement. One entry, for example, stated: "New acquisitions expected from outside

source [-] 4 per month." (Rodriguez Dep., Ex. 42).

At around this same time, HSBC hired another Premier Relationship Manager,

Alain Dieguez, to work alongside Rodriguez in the Miami Beach branch. HSBC divided

all of the Miami Branch's premier accounts between Rodriguez and Dieguez. (Rodriguez

Dep., pp. 82, 191-92).

On February 8, 2010, HSBC issued Rodriguez a formal "Corrective Action Form,"

which notified Rodriguez that he had not reached the improvement benchmarks identified

in his January counseling. The letter specified, for example, that "[Rodriguez] has not met

the goal of four (4) new acquisitions per month. He has averaged zero (0) new acquisitions

per month." (Rodriguez Dep., Ex. 44). The letter then provided a list of corrective actions that Rodriguez could take to improve his identified deficiencies. (Id.). The issuance of this Form made Rodriguez ineligible for incentive programs, awards, or merit increases for a period of thirty days. The Form also stated that if Rodriguez were to miss work for more than five consecutive workdays, his ineligibility period would be extended by the same amount of days as those missed. (Id.). The letter to Rodriguez concluded by warning him that "[m]inimal or unsatisfactory improvement in the area(s) described above at any time during or after this corrective action period may lead to further corrective action up to and including termination of employment." (Id.).

Later in February, while the Corrective Action Form was in effect, Rodriguez sought short-term-disability leave for a back and shoulder condition. (Rodriguez Dep., Ex. 52). That request was approved. (Id., Ex. 56).

Rodriguez returned from leave on June 7, 2010. Graison met with him on that day to discuss performance expectations, a conversation Graison again memorialized, this time in an email. (Rodriguez Dep., p. 203; Id., Ex. 45). Graison notified Rodriguez that he would be given two weeks to re-acclimate to the job before the Corrective Action Form would be reinstated. (Rodriguez Dep., Ex. 45). In other words, after two weeks, Rodriguez would again be held to the terms of his formal warning.

Re-acclimation ended on June 21, 2010, and Graison emailed Rodriguez and reminded him of the date's significance:

> [T]he reactivation of your written warning is in place starting today for the next two weeks[,] June 21st through July 2 . . . At that time we

> will evaluate your performance and design the next strategy plan. We
> have great confidence that you will adhere to the best of your abilities
> to work and excel in your results and we are looking forward to your
> success.

(Rodriguez Dep., Ex. 46).

By July 2, Graison and Jackson felt that Rodriguez had not responded as they had hoped to the February Corrective Action Form, so they issued him another Form in an effort "to continue with the process and the accomplishment of the objectives discussed above." (Rodriguez Dep., Ex. 23). This second warning, like the first one, specified various performance deficiencies. For example, it contained the following: "After four (4) weeks of his return [Rodriguez's] sales behaviors have not improved as expected. [Rodriguez] did not meet the acquisition requirement. He had zero (0) accounts for the whole month of June or the last 4 weeks." Like the first warning, it also notified Rodriguez that failure to improve could result in further corrective action or even termination. (Id.).

This second Corrective Action Form expired on August 20, 2010. HSBC did not issue a third. Rodriguez submitted his resignation letter to HSBC on August 26, 2010.

Rodriguez was HIV positive throughout his tenure at HSBC, but the disease had little, if any, impact on his job. (Rodriguez Dep., pp. 67-68). Although Rodriguez testified at his deposition that his HIV status caused him general fatigue, the occasional cold, and a few bouts with pink eye, he also testified that his HIV status "never" affected his ability to perform the functions of his job. (Rodriguez Dep., p. 68-69). On the disease's impact, he further testified: "I think that nothing limited me," "I am not disabled," and "I don't consider [HIV] a disability." (Id., at 217, 68).

While employed at HSBC, Rodriguez's HIV was "well controlled" and "well treated, [with] good t-cell subsets with no viral load." (Dkt. 14, Ex. 5). His HIV did not require medication. (Rodriguez Dep., p. 212). In fact, Rodriguez never took HIV medication while employed at HSBC. (Id.).

### Disputed Facts

In the months before Rodriguez resigned, HSBC began an on-site audit of insurance and fixed-annuity sales at the Miami Beach Branch. (Mackara Aff. ¶ 4). Rodriguez alleges that this review was subterfuge, that it was in fact an investigation designed to unearth mistakes Rodriguez had made in the past and that it was specifically targeting him as retaliation for being HIV positive. (Rodriguez Dep., p. 52). Rodriguez resigned, he claims, over fears that the investigation and its findings might have caused him to lose his license to sell insurance. (Id.).

HSBC disputes these assertions. The audit, the bank argues, was done of all HSBC Florida branches. (Mackara Aff. ¶ 4). And it was conducted by HSBC's Vice President of General Compliance, Bernie Mackara, who had no knowledge of Rodriguez's HIV status. (Id., ¶ 7). To bolster these assertions, the bank calls attention to the audit's results: the branch received a "Good" rating and neither Rodriguez nor any other branch employee was found to have committed any wrongdoing. (Id., ¶¶ 6, 7).

Rodriguez also claims that HSBC's decision to hire new Premier Relationship Manager Alain Dieguez and split the Premier accounts between the two of them was done

in retaliation for being HIV positive. The division of accounts, Rodriguez claims, caused Rodriguez to lose sales points, which reduced his commissions. (Rodriguez Dep., p. 83).

HSBC disputes Rodriguez's characterization of the new hire. It occurred, HSBC claims, because "[t]he book of business was so large that it was – it was really unmanageable for one person to be effective . . . ." (Jackson Dep., pp. 65-66). Rodriguez, HSBC argues, conceded this fact during his deposition:

Q: Do you think the decision to bring in a second premier relationship manager had anything to do with your HIV?

A: No. Because the book of business of Miami Beach was growing too fast.

(Rodriguez Dep., p. 191). As for the division of labor, HSBC points to the numbers themselves and the equitable distribution they represent: Rodriguez was assigned 292 clients with $43,985,017 in total deposits while Dieguez was assigned 232 clients with $42,030,081 in total deposits. (Witt Aff. ¶ 5).

Rodriguez claims that he notified Graisen that he was HIV positive at about the time he was promoted to Premier Relationship Manager, in 2007 or 2008, and that Graisen and Jackson began their retaliation against him, to include workplace harassment, sometime shortly thereafter. (Rodriguez Dep., pp. 108, 155-57). Although Rodriguez testified that he could not identify any discriminatory comments that either made in the workplace, he testified that Graisen made the job substantially more stressful. (Id. at 97-99). He alleges that Graisen "came into my face," told him to "watch out," and told co-workers that Rodriguez had complained to Human Resources. (Id. at 99, 108, 110).

Graisen, meanwhile, denies these claims. In fact, as a gay man, Graisen testified that he is very sympathetic to the plight of those suffering from HIV. And in any event, he testified that he never knew that Rodriguez was HIV positive. (Graisen Dep., p. 19).

Finally, Rodriguez claims that he was forced to resign to preserve his health and to save his license to sell insurance. (Dkt. 14, p. 2).

HSBC disagrees, and cites the fact that the audit Rodriguez so feared found no wrongdoing. HSBC also cites Rodriguez's resignation letter, wherein he praises Jackson, calls HSBC "the best bank in the world," and describes working there as a "great experience." (Rodriguez Dep., Ex. 22).

## PROCEDURAL BACKGROUND

On November 2, 2010, a few months after Rodriguez resigned from HSBC, he filed a Charge of Discrimination with the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission. (Rodriguez Dep., Ex. 9). The complaint accused Graisen and Jackson of disability discrimination for taking away Rodriguez's premier accounts and his commission points. (Id.). On September 27, 2013, the EEOC notified Rodriguez that it had investigated his complaint and was "unable to conclude" whether the law was violated. (Rodriguez Dep., Ex. 10). It also notified him of his ninety-day right to file suit.

Rodriguez filed his *pro se* complaint in state court on April 21, 2014. The one-page complaint did not cite a federal or state law, but it did specify that the "lawsuit is about

being discriminated by [sic] my HIV status." (Dkt. 2) It also named Graisen and Jackson as the culpable HSBC agents. HSBC removed the case to this Court.

Rodriguez filed an amended complaint on July 16, 2014. (Dkt. 14). Like the first complaint, it did not explicitly allege a violation of state or federal law. It did allege, however, that Rodriguez notified Graisen of his HIV status and that, sometime thereafter, Graisen took sales points from Rodriguez, almost hit Rodriguez on one occasion, and on another occasion announced to the branch staff that Rodriguez had complained to Human Resources about him. (Id.).

HSBC did not file a motion to dismiss or a motion for a more definite statement. Instead, HSBC filed an Answer, in which it denied violating the ADA. (Dkt. 15). The case proceeded to mediation, where the parties reached an impasse, and onto discovery.

## DISCUSSION

Now HSBC seeks summary judgment on all of Rodriguez's claims, even though HSBC's motion at various points has to surmise what Rodriguez's claims "appear" to be. (Dkt. 39, pp. 1, 2, 6, 8, 13). To resolve this motion, however, the Court cannot rely on such speculation. The Court must, as a threshold matter, evaluate Rodriguez's complaint to determine what his claims in fact are.

The Federal Rules of Civil Procedure require "a short plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citations omitted); Fed. R. Civ. P. 8(a)(2). Rule 8 requires courts

9

to give a liberal reading of complaints, especially when evaluating the complaints of *pro se* plaintiffs. *Digiro v. Pall Aeropower Corp.*, 19 F.Supp.2d 1304, 1306 (M.D. Fla. 1998) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). This requirement, however, "is not the equivalent of a duty to re-write" the complaint. *Peterson v. Atlanta Housing Authority*, 998 F. 2d 904, 912 (11th Cir. 1993).

Applying this standard, the Court construes Rodriguez's complaint as alleging a total of five counts: (1) disparate treatment and (2) a hostile work environment under the ADA; (3) disparate treatment and (4) a hostile work environment under the FCRA; and (5) constructive discharge under the ADA.[1]

With the claims now established, the Court may evaluate HSBC's motion for summary judgment.

### Summary Judgment Standard

A motion for summary judgment forces a court to "pierce the pleadings and [] assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Motions for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that

---

[1] The substantive provisions of the FCRA are interpreted consistent with the ADA, to include the latter's regulations and case law. *See* Fla. Stat. § 760.11; *see also Matthews v. Village Center Community Development Dist.*, No. 5:05-cv-344-Oc-10GRJ, 2006 WL 3422416, *8 (M.D. Fla. Nov. 28, 2006) (citations omitted). The Court will therefore expressly analyze only Rodriguez's ADA claims.

there is no genuine issue over any material fact and that the moving party is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; rather, the record must reveal a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original). Facts are material if, under the applicable substantive law, they might affect the outcome of the case. *See id*. And disputes over those facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*.

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To carry this burden, the moving party can present evidence to this effect or instead show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.* at 322-23

If the moving party meets its burden, non-moving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. Conclusory allegations will not suffice.

*Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Neither will "a mere scintilla of evidence supporting" the non-movant's claims. *Walker v. Darby*, 911 F.2d 1573, 1577 (1th Cir. 1990) (internal quotations omitted). The non-movant must instead present facts that are significantly probative to support those claims. *Anderson*, 477 U.S. at 248-49 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968) (requiring that "sufficient evidence supporting the claimed factual dispute be shown to [defeat the motion and] require a jury or judge to resolve the parties' differing versions of the truth")).

A court ruling on a motion for summary judgment must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson,* 477 U.S. at 255. After the non-moving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

### The Americans with Disabilities Act

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. §12112(a). Rodriguez claims that HSBC violated the law by subjecting him to disparate treatment and a hostile working environment and by constructively discharging him.

HSBC offers alternate theories of summary judgment. On all of Rodriguez's claims, HSBC argues that he has failed to make a prima facie case of employment discrimination.

On the disparate treatment claim, HSBC argues that even if Rodriguez has made a prima facie case, he cannot rebut HSBC's legitimate, non-discriminatory reasons for its employment actions. The Court agrees.

### *Disparate Treatment*

To establish a prima facie case of disparate treatment under the ADA, a plaintiff must prove three elements: (1) that he has a disability; (2) that he is a qualified individual; and (3) that he was subjected to unlawful discrimination because of the disability. *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 (11th Cir. 1997) (internal citations omitted). A plaintiff may satisfy these elements by presenting direct or circumstantial evidence of discrimination. *Compare Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) *with Matthews*, 2006 WL 3422416, at *8 (citing *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973)).

If a plaintiff establishes a prima facie case using circumstantial evidence, the burden then shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the employment action. *McDonnell-Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. 1817; *see Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004). If the employer does this, the burden shifts again, back to the plaintiff, *Goldsmith v. Bagby Elevator Co. Inc.*, 513 f.3d 1261, 1277 (11th Cir. 2008), who "must meet that reason head on and rebut it." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotations omitted). The plaintiff, in other words, must show that the proffered explanation is pretext for discrimination. *Id.* Challenging the wisdom of employer's reason is not enough. *Id.* The

plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotations omitted). If a plaintiff cannot meet this burden, summary judgment is appropriate. *See id*; *see also Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 2005)

Rodriguez claims that Graisen subjected him to disparate treatment after he learned that Rodriguez was HIV positive. But under the specific facts of this case, Rodriguez has failed to establish the first element of a disparate treatment claim: that he suffered from a disability as that term is defined by the law.

### 1.   "Disability" under the ADA

The ADA defines as disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). EEOC regulations seek to make this definition more "predictable, consistent, and workable" by listing specific impairments and the life activities they commonly impact. 29 CFR § 1630.2(j)(3)(i). These impairments, the regulations state, will "virtually always be found to impose a substantial limitation on a major life activity." 29 CFR § 1630.2(j)(3)(ii). One of the enumerated examples is HIV, which the regulations say "should easily be concluded" as substantially limiting immune function. 29 CFR § 1630.2(j)(3)(iii). More generally, the regulations note that the 2008 amendments to the ADA were intended "to make it easier for people with disabilities to obtain protection" and that, accordingly, "the definition of 'disability' …

shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA." 29 CFR § 1630.1(c)(4)

These regulations, however, are not controlling. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399 (1986). Instead, they represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* (internal quotations omitted).

The Court finds that the regulations are indeed persuasive, and the Court will resort to them. As to what exactly they mean, the Court interprets the regulations—particularly the words "virtually always" and "should easily be concluded"—as creating a strong presumption, yet a rebuttable one, that HIV is a disability under the statute.

Eleventh Circuit precedent countenances this interpretation. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 n. 4 (11th Cir. 2001). In *Waddell*, also an ADA employment discrimination case, the court affirmed summary judgment in favor of an employer on different grounds and declined to decide whether the employee, a dental hygienist, who had HIV, was disabled. *Id.* at 1284. But the court noted that the Supreme Court favors a case-by-case, factual approach to determining whether HIV constitutes a disability. *Id.* at 1279 n. 4 (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999) and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).

And although the question has not been a common one, trial courts in this circuit have applied this same approach. *See Zillyette v. Capital One Financial Corp.*, 1 F.Supp.2d

1435, 1441 (M.D. Fla. 1998) (concluding that fact question remained as to whether HIV positive plaintiff was disabled); *Solorio v. Am. Airlines, Inc.*, No. 00-3780-CIV, 2002 WL 485284, *5 (S.D. Fla. Feb. 28, 2002) ("HIV may cause some individuals to be ADA-disabled, but not all individuals infected will fall into that category."). So have courts in other circuits. *See Baptista v. Hartford Bd. Of Educ.*, 427 Fed. Appx. 39, 42 (2d Cir. 2011); *accord Blanks v. Southwestern Bell Commc'ns, Inc.*, 310 F.3d 398, 401 (5th Cir. 2002) (affirming summary judgment in favor of employer because HIV-positive plaintiff could not establish how the disease impacted a major life activity).

In short, while the hurdle necessary to establish that HIV is a disability per the ADA may be low, 29 CFR § 1630.1(c)(4), it is a hurdle nonetheless. Leaping it requires some proof. *Kuczynski v. Lyra Management, Inc.*, No. 08-62067, 2010 WL 2509843, *2 (S.D. Fla. June 18, 2010) (citing *Bragdon v. Abbott*, 524 U.S. 624, 641-42, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998)).

Here, the evidence—much of which Rodriguez himself supplied—overwhelmingly demonstrates that Rodriguez's HIV did not limit any of his major life activities while he was employed at HSBC. Rodriguez testified repeatedly that he did not consider his HIV a disability. (Rodriguez Dep., pp. 42, 68-69). In fact, he testified, "I never considered myself disabled." (Id., at 215). On the impact that HIV had on his job performance, Rodriguez testified, "I think that nothing limited me." (Id., at 217).

The testimony of Graisen corroborates this evidence. During his deposition Graisen expressed surprise that Rodriguez had been HIV positive while employed at HSBC because

Rodriguez was "[s]uper energetic." He added: "if we needed something done . . . like an event that we needed to distribute postcards and go to the street, Jose [would] do it." (Graisen Dep., p. 20).

Medical records paint a similar picture. A report from Rodriguez's primary physician, which Rodriguez attached to his complaint, describes his HIV as "well controlled" and "well treated." (Dkt. 14, Ex. 5). Furthermore, while at HSBC, Rodriguez was not using any medication to treat his HIV.

The only evidence supporting a finding of disability is Rodriguez's testimony that he got pink eye a few times while employed at HSBC, that he had a few colds, and that he suffered from fatigue. (Rodriguez Dep., pp. 31-32, 215-16). Rodriguez attributes these common ailments to the side-effects of HIV. This conclusory assertion might have sufficed to survive a motion to dismiss. *See Twombly*, 550 U.S. at 555. But in the absence of any evidence attributing these ailments to his HIV, and in the face of the substantial evidence proving that these ailment did not limit any of Rodriguez's major life activities, it does not suffice to survive a motion for summary judgment. *See Avirgan*, 932 F.2d at 1577.

On the unique facts of this case, Rodriguez did not, as a matter of law, have a disability as defined by the ADA while he was employed at HSBC. This finding alone defeats all of Rodriguez's claims and entitles HSBC to summary judgment.[2] The Court

---

[2] A plaintiff could still be protected under the ADA, without a disability, under the "regarded as" prong. 42 U.S.C. § 12102(1)(c). But Rodriguez has not alleged this theory of liability.

recognizes, however, that the law governing when HIV qualifies as a disability is not well developed. The Court will therefore proceed with the analysis as if Rodriguez had established that, in this case, HIV was a disability. As discussed below, his claims must still fail.

### 2.   Legitimate, non-discriminatory reasons

Rodriguez has not supplied any direct evidence of discrimination. *See Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (defining direct evidence as evidence "that, if believed, proves the existence of a fact without inference or presumption") (citations omitted). In fact, Rodriguez testified that he never once heard Graisen or Jackson make so much as a discriminatory comment. (Rodriguez Dep., p. 97). The Court must therefore apply the burden-shifting analysis the Supreme Court detailed in *McDonnell-Douglas*, which allows an employer to rebut a prima facie case of discrimination by articulating the legitimate, non-discriminatory reasons for its employment actions. 411 U.S. at 802.

HSBC has done this. As to each time in which Rodriguez was counseled or formally warned, HSBC has supplied evidence—including testimony, emails, and the counseling documents—to show the legitimate reasons for its actions. The evidence demonstrates, in short, that Rodriguez was falling short of the production standards HSBC expected of him. This kind of production deficiency was a legitimate reason for both the informal counseling and the formal warnings Rodriguez received. *See e.g.*, *Stewart v. Albertson's LLC*, 418 Fed. Appx. 885, 887 (11th Cir. 2011) (concluding that an uncooperative attitude and failure

to attend a mandatory meeting were legitimate reasons for termination); *McCoy v. Geico General Ins. Co.*, 510 F. Supp. 2d 739, 752 (M.D. Fla. 2007) (concluding that employee's failure to comply with workplace policies justified warnings and, ultimately, termination).

Rodriguez's work performance was likewise a legitimate reason to hire another Premier Relationship Manager, although the evidence also suggests that the new hire may have had nothing to do at all with Rodriguez or his performance. Jackson testified in his deposition that the business at the Miami Branch was growing too fast for any one person to handle. (Jackson Dep., pp. 65-66). Rodriguez agreed when he denied that HSBC brought in a new hire because of his HIV; instead, Rodriguez testified, HSBC hired Dieguez "[b]ecause the book of business of Miami Beach was growing too fast." (Rodriguez Dep., p. 82). In any event, personnel decisions made for business reasons, like the decision here to hire another employee, are legitimate, non-discriminatory reasons for employment actions. *See e.g.*, *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331-32 (11th Cir. 1998) (a drop in business justifies layoffs).

The evidence also reveals that any sales points Rodriguez may have lost resulted from this legitimate decision to hire a new Premier Relationship Manager and split the accounts between them. Rodriguez's commissions were governed by an HSBC Premier Relationship Manager Incentive Plan, which calculated commissions based on revenue generated. (Witt Aff. ¶ 6). According to HSBC Assistant Vice President and Payments Administrator, Kyle Witt, who managed the Incentive Plan, at no time did Graisen or Jackson have the authority or even the ability to take sales points away from Rodriguez, as

he alleges. (Id., at ¶ 7). The points were simply redistributed consistent with the redistribution of work.

Finally, banks do internal audits and compliance reviews as a matter of course for any number of legitimate reasons, to include ensuring legal and regulatory compliance. HSBC offered evidence that its 2010 audit of the Miami Beach Branch was precisely this kind of compliance review. (Mackara Aff. ¶ 4).

To these explanations for HSBC's employment actions, Rodriguez has not supplied any meaningful rebuttal tending to prove that the explanations are in fact pretext for discrimination. On the decision to hire Dieguez, in fact, Rodriguez seemingly agrees with HSBC's reasoning that business was getting too big. On the other employment actions, Rodriguez only offers more emphatic—and no less conclusory—claims that Graisen discriminated against him once Graisen learned that he was HIV positive. But the law on this point is clear: "conclusory allegations or unsupported assertions of discrimination, without more, do not raise an inference of pretext where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Gilliard v. Georgia Dept. of Corrections*, 500 Fed. Appx. 860, 865 (11th Cir. 2012) (quoting *Mayfield Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)).

Assuming that Rodriguez has made a prima facie case for disparate treatment under the ADA, the Court finds HSBC has presented legitimate, non-discriminatory reasons for each of its employment actions—reasons that Rodriguez has failed to adequately rebut. Summary judgment on this claim will be granted. *See Combs v. Plantation Patterns*, 106

F.3d 1519, 1534-35 (11th Cir. 1997) (holding that employer is entitled to judgment as a matter of law when the reasons for the employer's actions remain unrebutted).

### Hostile Work Environment

Rodriguez also claims that, upon learning that Rodriguez was HIV positive, Graisen harassed him and created a hostile work environment. An ADA hostile work environment claim is governed by the same standards as a Title VII claim. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000). Accordingly, a prima facie case requires a plaintiff to establish that (1) he was disabled as defined by the law; (2) he was subject to unwelcome conduct; (3) the harassment was based on the disability; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) a basis for holding the employer liable. *Id.*

According to the Eleventh Circuit, it is the fourth element "that tests the mettle of most [hostile environment] harassment claims." *Id.* at 583. It has both an objective and subjective component. *Gowski v. Peake*, 682 F.3d at 1299, 1311-12 (11th Cir. 2012). This means that the plaintiff must "subjectively perceive" the harassment as severe enough to change the terms of his employment, and the harassment must result in an environment that a reasonable person would find hostile or abusive. *Id.* In evaluating the objective component, courts should consider all the circumstances surrounding the retaliatory conduct, to include its frequency and severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's job performance. *Id.*

Throughout this inquiry, courts must remain mindful that the "standards for judging hostility are sufficiently demanding to ensure that [a proscription against hostile work environments] does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275 (1998) (internal quotations omitted). To that end, "conduct must be extreme to amount to a change in the terms and conditions of employment." The workplace must be "permeated with discriminatory intimidation, ridicule, and insult." *Harris Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation marks omitted).

Simple teasing, offhand comments, and isolated incidents do not suffice. *Id; see e.g.*, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254-56 (11th Cir. 2014). Neither do a supervisor's critique of an employee's job performance. *See McCoy v. Macon Water Authority*, 966 F.Supp. 1209, 1221 (M.D. Ga. 1997); *accord Rattigan v. Holder*, 604 F.Supp.2d 33, 49 (D.D.C. 2009). As the Eleventh Circuit has stated about hostile work environment claims, "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (internal quotations omitted).

As previously discussed, the Court finds that Rodriguez, under the unique facts of this case, was not disabled as that term is defined by the law. His hostile work environment claim must also fail, for that reason. But even if he was disabled, it must fail for another reason: the facts, construed in the light most favorable to Rodriguez, do not satisfy the critical fourth element.

Rodriguez makes a general allegation that Graisen made his job more stressful. He also testified that Graisen once yelled in his face and told him to watch out. (Rodriguez Dep., p. 100, 108). Additionally, in front of other Branch employees, Graisen once announced to the group that Rodriguez had called Human Resources to complain about Graisen. (Id., at 119). These incidents of harassment, Rodriguez testified, caused him to cry almost daily.

Nonetheless, these incidents, spread over the six years Rodriguez worked at HSBC, certainly qualify as isolated. And they hardly describe a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris Forklift Sys., Inc.*, 510 U.S. at 21 (1993); *see e.g.*, *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1223 (M.D. Ala. 2002) (concluding that evidence of boss mocking plaintiff in front of a group of employees would fall "far, far short of that required to satisfy the 'severe or pervasive' element).

Rodriguez may have faced some ridicule and personal animosity at work. But such are the "ordinary tribulations" of the workplace which do not establish a cause of action for a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. at 778. Summary Judgment will be granted.

### *Constructive Discharge*

Rodriguez's last count is one for constructive discharge. The terms and conditions of Rodriguez's employment got so intolerable, he alleges, that he was forced to resign. But the legal standard is whether "a reasonable person in [his] position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th

Cir. 1997) (internal quotations marks omitted). In the Eleventh Circuit and elsewhere, this standard demands that a plaintiff show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment claim. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992)).

Because Rodriguez has failed, as a matter of law, to establish a prima facie case for a hostile work environment, his constructive discharge claim must also fail. *See Moren v. Progress Energy, Inc.*, No. 8:07-cv-1676-T-17, 2008 WL 3243860, *6 (M.D. Fla. Aug. 7, 2008). Summary Judgment on this last count is also appropriate.

For the foregoing reasons, it is ORDERED AND ADJUDGED that:

1. Defendant's Motion for Summary Judgment (Dkt. 39) is GRANTED.

2. The Clerk is directed to enter judgment in favor of Defendant on all counts.

3. The Clerk is further directed to close this file and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this 23rd day of November, 2015.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2014\14-cv-945 - SJ Grant.docx